IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FREEDOM DEFENSE INITIATIVE,<br>1040 First Avenue<br>Room 121<br>New York, New York 10022<br><br>PAMELA GELLER,<br>1040 First Avenue<br>Room 121<br>New York, New York 10022<br><br>ROBERT SPENCER,<br>373 South Willow Street, #109<br>Manchester, New Hampshire 03103<br><br>JIHAD WATCH,<br>373 South Willow Street, #109<br>Manchester, New Hampshire 03103<br><br>    Plaintiffs,<br><br>  v.<br><br>LORETTA LYNCH, in her official capacity as Attorney General of the United States, Department of Justice<br>10th & Pennsylvania Avenue, NW<br>Washington, D.C. 20530<br><br>    Defendant. | **COMPLAINT** |

Plaintiffs American Freedom Defense Initiative ("AFDI"), Pamela Geller, Robert Spencer, and Jihad Watch (collectively referred to as "Plaintiffs"), by and through undersigned counsel, bring this Complaint against the above-named Defendant, her employees, agents, and successors in office, and in support thereof allege the following upon information and belief:

## INTRODUCTION

1.  This is a civil action in which Plaintiffs seek to protect their fundamental right to freedom of speech and to be free from unlawful discrimination based upon their religious and political beliefs and views.

2.      Plaintiffs seek a preliminary and permanent injunction enjoining Section 230 of the Communications Decency Act, which permits Facebook, Twitter, YouTube and others to engage in government-sanctioned discrimination and the suppression of free speech.

## JURISDICTION AND VENUE

3.      This action in which the United States is a defendant arises under the Constitution and laws of the United States.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1346.

4.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

5.      Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(e) because Defendant resides in this district and a substantial part of the acts giving rise to Plaintiffs' claim occurred in this district.

## PARTIES

6.      Plaintiff AFDI is a nonprofit organization that is incorporated under the laws of the State of New Hampshire.  AFDI is dedicated to freedom of speech, freedom of conscience, freedom of religion, and individual rights.

7.      As a nonprofit organization, AFDI is dependent upon charitable donations from donors, including donors in California.

8.      AFDI achieves its objectives through a variety of lawful means, including through the exercise of its right to freedom of speech under the United States and California Constitutions.

9.      AFDI exercises its right to freedom of speech and promotes its objectives through the use of social media, including Facebook, Twitter, and YouTube.

10.      Plaintiff Pamela Geller is the president of AFDI, and she engages in protected speech through AFDI's activities, including AFDI's use of social media, which include Facebook, Twitter, and YouTube.

11.      Plaintiff Robert Spencer is the vice president of AFDI, and he engages in protected speech through AFDI's activities, including AFDI's use of social media, which include Facebook, Twitter, and YouTube.

12.      In addition to being the president of AFDI, Plaintiff Geller is the publisher of PamelaGeller.com and author of *The Post-American Presidency: The Obama Administration's War on America* and *Stop the Islamization of America: A Practical Guide to the Resistance*.

13.      Plaintiff Geller is the administrator of the following Facebook pages: "Islamic Jew-Hatred: It's in the Quran," "Pamela Geller," "Islamic Antisemitism: It's in the Quran," "SIOA: Stop Islamization of America," "SION: Stop Islamization of Nations," and "American Freedom Defense Initiative."

14.      Plaintiff Geller's Facebook pages have over 400,000 "likes."

15.      Many of Plaintiff Geller's followers, donors, and customers are from California, including donors who support her non-profit work and customers who purchase her books and advertisements that further support her work.

16.      Plaintiff Geller also manages several YouTube channels, including the Pamela Geller YouTube channel, which has over 16,000 subscribers.

17.      In addition to being the vice president of AFDI, Plaintiff Spencer is the director of Jihad Watch and the author of fifteen books, including the *New York Times* bestsellers *The Truth*

*About Muhammad* and *The Politically Incorrect Guide to Islam (and the Crusades)*.  His latest books are *The Complete Infidel's Guide to ISIS* and *The Complete Infidel's Guide to Iran*. Plaintiff Spencer sells his books through Jihad Watch and through Facebook, Twitter, and YouTube.

18.     Plaintiff Jihad Watch is a nonprofit organization that is incorporated under the laws of the State of New Hampshire.  Jihad Watch is dedicated to freedom of speech, freedom of religion, and individual rights.  More specifically, Jihad Watch is dedicated to exposing the truth, including the motives and goals, of Islamic jihadists.

19.     Pursuant to its website (www.jihadwatch.org), Jihad Watch seeks to bring public attention to:

- "The plight of the dhimmis, an immense but almost completely ignored ongoing scandal that continues in Muslim countries today;

- The plight of women under Sharia provisions, similar to conditions imposed on dhimmis, in the denial of equal rights and dignity;

- Slavery in Islamic lands, which continues today, justified by Sharia's dhimmi codes;

- The integral role of jihad and dhimmitude ideology in global terrorism today;

- The license that academic and journalistic whitewashes of dhimmitude gives to radical jihadist enemies of human rights for all."

20.     Pursuant to its website, "Jihad Watch fights to ensure that deeds done in the darkness for so long will not continue to be done.  The light of world attention is anathema to the proponents of jihad and dhimmitude: we have seen in recent years that women sentenced to stoning for adultery, often victims of rape unjustly accused thanks to Sharia laws disallowing

rape victims' testimony, were freed following international outcry.  Jihad Watch seeks to provoke similar, continuous and increasing outcry wherever and whenever the Sharia's institutionalized injustices threaten dhimmis and women.  May the truth prevail."

21.     Plaintiff Spencer is the administrator of the Jihad Watch Facebook page, which promotes his free speech and business interests and the free speech and nonprofit interests of Jihad Watch.  The Jihad Watch Facebook page has over 35,000 likes.

22.     Plaintiff Spencer is also the administrator of the JihadWatchVideo YouTube channel, which has over 11,000 subscribers.

23.     As a nonprofit organization, Jihad Watch is dependent upon charitable donations from donors, including donors in California.

24.     Jihad Watch achieves its objectives through a variety of lawful means, including through the exercise of its right to freedom of speech under the United States and California Constitutions.

25.     Jihad Watch exercises its right to freedom of speech and promotes its objectives through the use of social media, including Facebook, Twitter, and YouTube, which are linked to its website.

26.     Plaintiffs make wide use of Facebook, Twitter, and YouTube to promote their religious and political messages as well as to promote their non-profit work and commercial interests.

27.     Plaintiffs actively seek business connections with California consumers, readers, viewers, and listeners.

28.     Defendant Loretta Lynch is the Attorney General of the United States.  In her official capacity as Attorney General, Defendant Lynch enforces the laws of the United States, including Section 230 of the Communications Decency Act ("CDA").  47 U.S.C. § 230.

## FACTUAL ALLEGATIONS

### Social Media—a Forum for Speech and Commercial Transactions

29.     The Internet is an international network of interconnected computers.  It is a unique and wholly new medium of worldwide human communication.

30.     Anyone with access to the Internet may take advantage of a wide variety of communication and information retrieval methods.  These methods are constantly evolving and difficult to categorize precisely.  All of these methods can be used to transmit text; most can transmit sound, pictures, and moving video images.  Taken together, these tools constitute a unique medium—known to its users as "cyberspace"—located in no particular geographical location but available to anyone, anywhere in the world, with access to the Internet.

31.     At any given time, millions of users are engaging in conversations on a huge range of subjects.  It is no exaggeration to conclude that the content on the Internet is as diverse as human thought.

32.     The Internet is thus comparable, from the readers' viewpoint, to a vast library including millions of readily available and indexed publications, a sprawling mall offering goods and services, or a vast public forum providing an opportunity to speak and/or learn about issues of great public concern.  Thus, the Internet constitutes a vast platform and forum from which to address and hear from a world-wide audience of millions of speakers, readers, viewers, researchers, sellers, and consumers.

33.     Unlike the conditions that prevailed when Congress first authorized regulation of the broadcast spectrum, the Internet can hardly be considered a "scarce" expressive commodity. It provides relatively unlimited, low-cost capacity for communication of all kinds.

34.     This dynamic, multifaceted category of communication includes not only traditional print and news services, but also audio, video, and still images, as well as interactive, real-time dialogue.

35.     Twitter is a California corporation with an office in Washington, D.C.  Twitter, one of the world's largest social media forums, actively seeks business connections with Californian consumers, and its principal place of business is in California.

36.     Facebook is a California corporation with an office in Washington, D.C.  Facebook, one of the world's largest social media forums, actively seeks business connections with Californian consumers, and its principal place of business is in California.

37.     YouTube is a California corporation.  YouTube, one of the world's largest social media forums, actively seeks business connections with Californian consumers, and its principal place of business is in California.

38.     Through the use of Facebook, Twitter, or YouTube, any person with access to the Internet can become a town crier with a voice that resonates farther than it could from any soapbox.

39.     Through the use of Facebook or Twitter, the same individual can become a pamphleteer.

40.     In sum, the Internet has become the new marketplace of ideas.

41.     Today, the impact of the Internet as a medium of worldwide human communication cannot be overstated.

42. Consequently, social media, particularly including Facebook, Twitter, and YouTube, are exceedingly important for worldwide human communication and thus provide important forums for that communication.

43. Denying a person or organization access to these important social media forums based on the content and viewpoint of the person's or organization's speech on matters of public concern is an effective way of silencing or censoring speech and depriving the person or organization of political influence and business opportunities.

44. Due to the importance of social media to political, social, and commercial exchanges, the censorship at issue in this Complaint is an unmatched form of censorship.

45. Consequently, there is no basis for qualifying the level of First Amendment scrutiny that should be applied in this case.

### California Civil Code § 51

46. Section 51 of the California Civil Code provides, in relevant part,

All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

Cal. Civ. Code § 51(b).

47. Section 51 of the California Civil Code is broadly construed to include all forms of discrimination. That the act specifies particular kinds of discrimination—sex, color, race, religion, ancestry, and national origin—serves as illustrative, rather than restrictive, indicia of the type of conduct condemned.

48.     In light of its history and application, it is a violation of § 51 of the California Civil Code for a business establishment to discriminate on the basis of political affiliation, religious affiliation, or political or religious beliefs, including speech expressing those beliefs.

49.     Businesses that provide Internet services in California, such as Facebook, Twitter, and YouTube, are subject to § 51 of the California Civil Code.

50.     There are no legitimate business reasons for the government-sanctioned discrimination by Facebook, Twitter, and YouTube as set forth in this Complaint.

51.     Facebook's, Twitter's, and YouTube's discrimination against Plaintiffs as set forth in this Complaint violates § 51 of the California Civil Code.

52.     Facebook's, Twitter's, and YouTube's discrimination against Plaintiffs as set forth in this Complaint is largely religion-based in that these California businesses are favoring adherents of Islam over those who are not in violation of § 51 of the California Civil Code.

53.     Facebook's, Twitter's, and YouTube's discrimination against Plaintiffs as set forth in this Complaint is also based upon Plaintiffs' political and religious views in violation of § 51 of the California Civil Code.

54.     Facebook, Twitter, and YouTube are permitted to engage in their discriminatory business practices which violate California law because the federal government, through § 230 of the Communications Decency Act, permits them to do so.

## Article I, section 2 of the California Constitution

55.     Article I, section 2 of the California Constitution provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right.  A law may not restrain or abridge liberty of speech or press."

56.     The California Constitution's liberty of speech clause explicitly provides a "right" to freedom of speech, and it applies against private actors in certain public forums.  *See Robins v. Pruneyard Shopping Ctr.*, 23 Cal. 3d 899 (1979).

57.     The Internet is a public forum in which Plaintiffs are permitted to exercise their right to free speech under Article I, section 2 of the California Constitution.

58.     Plaintiffs' political and religious messages conveyed through Facebook, Twitter, and YouTube as set forth in this Complaint constitute speech that is fully protected by the California Constitution.

59.     Facebook's, Twitter's, and YouTube's restrictions on Plaintiffs' speech as set forth in this Complaint are not reasonable limitations as to time, place, or manner.  Rather, these restrictions are content- and viewpoint-based.

60.     Facebook's, Twitter's, and YouTube's censorship of Plaintiffs' speech as set forth in this Complaint violates Article I, section 2 of the California Constitution.

61.     Facebook, Twitter, and YouTube are permitted to engage in their censorship of speech which violates the California Constitution because the federal government, through § 230 of the Communications Decency Act, permits them to do so.

**Section 230 of the Communications Decency Act**

62.     Section 230 of the Communications Decency Act ("CDA") provides, in relevant part, as follows:

(c)   Protection for "Good Samaritan" blocking and screening of offensive material.
    (1)   Treatment of publisher or speaker.   No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.
    (2)   Civil liability.  No provider or user of an interactive computer service shall be held liable on account of—

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1) [subparagraph (A)].

47 U.S.C. § 230(c).

63.     Section 230 further provides the following: "State law.  Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section.  No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  *Id.* at § 230(e)(3).

64.     Section 230 further states as follows:

(f)     Definitions.  As used in this section:

(1)  Internet.  The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

(2)  Interactive computer service.  The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

(3)  Information content provider.   The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

(4)  Access software provider.  The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

(A) filter, screen, allow, or disallow content;
(B) pick, choose, analyze, or digest content; or
(C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

47 U.S.C. § 230(f).

65.     Neither before nor after the enactment of the CDA have the vast democratic forums of the Internet been subject to the type of government supervision and regulation that has attended the broadcast industry.  Moreover, the Internet is not as invasive as radio or television.

66.     As set forth in this Complaint, by way of § 230 of the CDA, the federal government is empowering discrimination and the censorship of speech in these vast democratic forums.

67.     Section 230 permits content- and viewpoint-based censorship of speech.  By its own terms, § 230 permits Facebook, Twitter, and YouTube "to restrict access to or availability of material that [they] consider[] to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable."

68.     Section 230 confers broad powers of censorship, in the form of a "heckler's veto," upon Facebook, Twitter, and YouTube censors, who can censor constitutionally protected speech and engage in discriminatory business practices with impunity by virtue of this power conferred by the federal government.

69.     The interest in encouraging freedom of expression in a democratic society outweighs any benefit of censorship conferred upon Facebook, Twitter, and YouTube by the federal government.

70.     Section 230 is not tied to a specific category of speech that is generally proscribable (*i.e.*, obscenity), nor does it provide any type of objective standard whatsoever.  The statute does permit the restriction of obscenity, but it also permits censorship of speech that is "otherwise objectionable, whether or not such material is constitutionally protected."  47 U.S.C. § 230(c)(2)(A).  Further, the subjective "good faith" of the censor does not remedy the vagueness issue, it worsens it.

71.     Facebook, Twitter, and YouTube fall under the provisions of § 230 and are therefore permitted to engage in their discriminatory practices by the federal government.

72.     Section 230, as applied, operates as a government-enforced heckler's veto.

73.     Section 230 is vague and overbroad and lacks any objective criteria for suppressing speech.

74.     Section 230 permits Facebook, Twitter, and YouTube to engage in government-sanctioned discrimination and censorship of free speech.

75.     State action lies in the enactment of a statute such as § 230 because it alters legal relations between persons, including the selective withdrawal from one group of legal protections against private acts, regardless of whether the private acts are attributable to the State.

76.     Section 230 is a statute that alters the legal relations between Plaintiffs and Facebook, Twitter, and YouTube, resulting in the withdrawal from Plaintiffs of legal protections against private acts.  Consequently, state action lies in Plaintiffs' challenge.

77.     Defendant Lynch, in her official capacity as the United States Attorney General, is the government official ultimately responsible for enforcing § 230.

**Censorship and Discrimination**

78.     Plaintiff Geller has been repeatedly warned and blocked on Facebook for her reportage about violent and stealthy jihad activity, sharia oppression of women and non-Muslims, and her other activity for human rights, activity which she engages in to promote her nonprofit work as well as her commercial interests.

79.     In March 2016, Plaintiff Geller's Facebook page, "Islamic Jew-Hatred: It's In the Quran" (hereinafter "Islamic Jew-Hatred page") was censored by Facebook because it was

allegedly "hate speech."   However, the page ran the actual Quranic texts and teachings that called for hatred and incitement of violence against Jews.

80.     When Facebook censored Plaintiff Geller's Islamic Jew-Hatred page, photos of Muslims, such as the one appearing below, were removed by Facebook.



81.     The photograph appearing in the paragraph above is an actual photo of a Muslim holding a sign stating, "Death to the Juice" at an anti-Israel rally in New York City.   The photograph was taken by Plaintiff Geller's colleague.   Plaintiff Geller did not violate any copyright law by posting the photograph.

82.     Facebook censored Plaintiff Geller's speech, claiming that the speech violated the "Facebook Community Standards."

83.     The content of Plaintiff Geller's page was simply factual, yet the page was censored by Facebook.   The page was up for only two weeks, and in that short time, it had 10,000 "likes."

84.     The discriminatory way in which Facebook applies its restrictions is evidenced by the fact that Facebook allows vicious posts and pages against Israel to stand, but when Plaintiff Geller and others expose the truth behind that Islamic hatred, the speech is prohibited.

85.     In March 2016, Facebook also sent a warning to Plaintiff Geller, directing her to "remove anything on Stop Islamization of America that doesn't comply with these policies," referring to the Facebook Community Standards.  Facebook's warning appears below:



86.     Facebook's objection to Plaintiff Geller's "Stop Islamization of America" page was a photo of Muslims daubing a building with "Kill the Jews" and "Jihad against Israel." Facebook's removal notice appears below:



87.     In June 2016, Facebook censored Plaintiff Geller's SIOA: Stop Islamization of America page in the wake of the deadly Islamic terror attack in Orlando, Florida because the page included posts critical of Islam. Facebook's notice appears below:



88.     Facebook's discrimination in favor of anti-Semites over Jews was demonstrated by an experiment conducted by a pro-Israel organization. The organization created two Facebook groups with nearly identical content, but with the words "Jews/Israelis" and "Arabs/Palestinians" swapped.



89.     The organization posted a video titled "The Big Facebook Experiment" (https://www.youtube.com/watch?v=i3KfQoFHEDs), showing Facebook's anti-Israel and pro-Palestinian bias.

90.     The organization's pro-Israel group page included a post stating, "Death to all the arabs," while the organization's pro-Palestinian group page included a post stating, "Death to all the jews."   Images of relevant parts of the posts appear below:



91.     The organization continued posting messages to both pages, including a message on the pro-Israel group's page stating, "Death to Palestine!!" and a similar message on the pro-Palestinian group's page stating, "Death to Israel!!"

92.     The organization reported both groups to Facebook.   Facebook closed the pro-Israel group's page, claiming that it violated the Facebook Community Standards.   Facebook did not close the pro-Palestinian group's page.

93.     The organization's experiment provides empirical evidence demonstrating that Facebook discriminates in favor of certain political parties, national origins, and religions, and it discriminates against Israelis and Jews in particular.

94.     The organization's experiment provides empirical evidence demonstrating that Facebook's application of the Facebook Community Standards discriminates against Plaintiffs, their businesses, and their viewpoints.

95.     The Facebook Community Standards are vague and standardless restrictions that Facebook arbitrarily and discriminatorily applies to suppress the speech and activities of certain speakers and organizations that it disfavors, including Plaintiffs.

96.     The   Facebook   Community   Standards   are   available   online   at https://www.facebook.com/communitystandards.

97.     The Facebook Community Standards are made possible by § 230 of the CDA.

98.     YouTube has similarly adopted Community Guidelines, which are available online at https://www.youtube.com/yt/policyandsafety/communityguidelines.html.

99.     The YouTube Community Guidelines are made possible by § 230 of the CDA.

100.     The YouTube Community Guidelines prohibit, *inter alia*, "hateful content," which YouTube describes and vaguely defines as "hate speech."

101.     For example, YouTube recently censored a counter jihad video, claiming that it was "hate speech" in violation of its Community Guidelines.  The video was produced by the Center for Security Policy, a Washington, D.C. public policy organization dedicated to promoting U.S. national security.  The counter jihad video contained a factual analysis of the threat of ISIS and radical Islam.

102.     Plaintiff Geller's YouTube channel is often censored by YouTube officials pursuant to the Community Guidelines.  For example, YouTube removed a video posted by Plaintiff Geller that was of a first-hand undercover investigation conducted in the Al-Farooq mosque in Nashville, Tennessee.  The video contained audio of a seven-year-old Muslim girl talking about her *husband* and how she and others were often beaten during sharia classes held at the mosque.

103.     Twitter has similarly incorporated a policy for restricting access to its business. Twitter's policy is called "Ad Policy: Hate content, sensitive topics, and violence," and is available online at https://support.twitter.com/articles/20170425?lang=en.

104.     The Twitter speech restricting policy applies to "Twitter Ads," as well as "paid advertising products" including all "Tweets," as well as "trends and accounts."

105.     Pursuant to its policy, "Twitter prohibits the promotion of hate content, sensitive topics, and violence globally."

106.     Pursuant to its policy, Twitter bans, *inter alia*, "Hate speech or advocacy against an individual, organization or protected group based on race, ethnicity, national origin, color, religion, disability, age, sex, sexual orientation, gender identity, veteran status or other protected status."

107.     Pursuant to its policy, Twitter also bans "Organizations or individuals associated with promoting hate, criminal, or terrorist-related content."  Consequently, Twitter distinguishes "hate" from "terrorist-related content" and seeks to ban both.  However, it is not just terrorists who engage in "terrorist-related" speech; it is also those, such as Plaintiffs, who write about terrorism and what motivates terrorists to engage in such violence.  Thus, Twitter's policy makes no distinction, for example, between ISIS and Plaintiffs.

108.     Before concluding with a ban on "Offensive, vulgar, abusive or obscene content," the Twitter policy also bans "Inflammatory content which is likely to evoke a strong negative reaction or cause harm."  This prohibition codifies a "heckler's veto."  The First Amendment of the U.S. Constitution and Article I, section 2 of the California Constitution emphatically reject the notion that speech obviously not intended to incite violence (indeed, often intended to expose savagery) should be banned simply because uncivilized people might react to it with violence, threats, and other perilous, intimidating behavior.

109.     Twitter elaborates that its censorship policy does not apply to "News and information that calls attention to hate, sensitive topics, or violence, but does not advocate for it."  However, that exemption does not include commentary on "news and information."  Twitter provides a separate exemption for "commentary" that is much more narrow: The prohibition does not apply to "commentary about products, services, companies, or brands, including potentially negative commentary."  Thus, if "commentary" "calls attention to hate, sensitive

topics, or violence," Twitter reserves the right to ban it even if the commentary "does not advocate" hatred, violence, or other offenses to someone's delicate sensibilities.

110.   The Twitter policy is an effort to shape public understanding of what is and is not tolerable speech.

111.   The Twitter policy is made possible by § 230 of the CDA.

112.   The Twitter policy, in effect, mirrors Islamic blasphemy standards as applied to censor speech critical of Islam, such as Plaintiffs' speech.

113.   One of the prime movers in the campaign to impose Islamic blasphemy standards and other aspects of sharia law on the West is Saudi Arabia.

114.   In 2011, Prince Alwaleed bin Talal—a prominent member of the Saudi royal family with a prodigious record of buying up and influencing Western media and educational institutions—spent $300 million to purchase Twitter stock.  By the end of 2015, bin Talal had doubled his investment in Twitter.  His stake now has a market value of approximately $1 billion, good enough for a 5 percent share.

115.   The sharia justice system that bin Talal's family promotes strictly enforces sharia blasphemy strictures.  In fact, it is commonplace for Saudi blasphemy prosecutions to be based on social-media postings on Twitter, Facebook, and the like.

116.   Twitter's policy tracks sharia blasphemy strictures and is often used to enforce those strictures on persons and organizations that criticize Islam, such as Plaintiffs.

117.   Twitter professes a policy of protecting intellectual property.  However, that policy is also applied in a discriminatory manner.

118.   Plaintiff Spencer, on his behalf and on behalf of Jihad Watch, a name which is protected by U.S. copyright and trademark law, has complained to Twitter about the unlawful

use of Jihad Watch by another Twitter account (American Jihad Watch).  However, Twitter has determined that this did not constitute a trademark infringement, permitting the intellectual property violation to continue, and thus harming Plaintiff Spencer's and Jihad Watch's interests.

119.    Facebook professes a policy of protecting intellectual property.  However, that policy is also applied in a discriminatory manner.

120.    Plaintiff Spencer has complained to Facebook about the unlawful use of Jihad Watch by another Facebook page (American Jihad Watch).  However, Facebook has determined that this did not constitute a trademark infringement, permitting the intellectual property violation to continue, and thus harming Plaintiff Spencer's and Jihad Watch's interests.

121.    While Facebook and Twitter allegedly prohibit threats of violence, Plaintiff Spencer has received numerous threats against his life on Facebook and Twitter.

122.    Plaintiff Spencer reported these threats to Twitter.  However, Twitter denied that these threats violate its terms of service policy, and thus permitted the threats to continue.

123.    On May 28, 2016, a Twitter user "tweeted" that Plaintiff Spencer should be "lynched."  Plaintiff Spencer promptly reported the threat, but Twitter did nothing, and the threat remained.  On May 12, 2014, a Twitter user "tweeted" that Plaintiff Spencer should "be arrested and lynched."  Plaintiff Spencer promptly reported the threat, but Twitter did nothing, and the threat remained.  On September 18, 2013, a Twitter user "tweeted" that Plaintiff Spencer "must be shot [in the] head."  Plaintiff Spencer promptly reported the threat, but Twitter did nothing, and the threat remained.  In all of these cases, Twitter informed Plaintiff Spencer that the threats did not violate its terms of service policy.

124.    The Twitter user making threats against Plaintiff Spencer also has a Facebook page which contained the same threats.  These threats were eventually removed, but not until the

effects of the threats were felt by Plaintiff Spencer.  The Facebook page containing the threats has not been closed by Facebook.

125.    In sum, Facebook, Twitter, and YouTube censor voices they dislike, and Facebook and Twitter often allow threats directed against those same voices to remain, thereby engaging in unlawful discrimination and censorship, all of which are made possible by § 230 of the CDA.

126.    Facebook has also discriminated against conservatives and censored conservative points of view in general.  Facebook officials running its "trending" news section ("news curators" as labeled by Facebook) actively ignore, and thus exclude, news items about conservative events and politicians.  And these news curators often exclude articles from conservative news sources like *Breitbart* and *The Washington Times.*

127.    Allowing social media giants Facebook, Twitter, and YouTube to engage in such blatant censorship and discrimination as set forth in this Complaint free from any liability has severe and adverse consequences far beyond the harm caused to Plaintiffs.  Indeed, by selectively targeting certain groups and political and religious views for disfavored treatment, Facebook, Twitter, and YouTube are able to shape public policy and unduly influence political elections to the detriment of our democratic form of government.

## CLAIM FOR RELIEF

### (Violation of Free Speech – First Amendment)

128.    Plaintiffs hereby incorporate by reference all stated paragraphs as though fully set forth herein.

129.    Section 230 of the CDA, facially and as applied, is a content- and viewpoint-based restriction on speech in violation of the First Amendment.

130.    Section 230 of the CDA, facially and as applied, is vague and overbroad and lacks any objective criteria for suppressing speech in violation of the First Amendment.

131.    Section 230 of the CDA, facially and as applied, permits Facebook, Twitter, and YouTube to engage in government-sanctioned discrimination and censorship of free speech in violation of the First Amendment.

132.    Section 230 of the CDA, facially and as applied, permits Facebook, Twitter, and YouTube to engage in government-sanctioned discrimination that would otherwise violate California Civil Code § 51.

133.    Section 230 of the CDA, facially and as applied, permits Facebook, Twitter, and YouTube to engage in government-sanctioned censorship of speech that would otherwise violate Article I, section 2 of the California Constitution.

134.    Section 230 of the CDA, facially and as applied, confers broad powers of censorship, in the form of a "heckler's veto," upon Facebook, Twitter, and YouTube officials, who can censor constitutionally protected speech and engage in discriminatory business practices with impunity by virtue of this power conferred by the federal government in violation of the First Amendment.

135.    Section 230 of the CDA, facially and as applied, grants Facebook, Twitter, and YouTube and their officers, agents, and employees unbridled discretion to censor Plaintiffs' speech such that their decisions to limit Plaintiffs' speech are not constrained by objective criteria, but may rest on ambiguous and subjective reasons in violation of the First Amendment.

136.    Section 230 of the CDA, facially and as applied, permits Facebook, Twitter, and YouTube to restrict Plaintiffs' speech based on its content and viewpoint in violation of the First Amendment.

137.    Section 230 has caused, and will continue to cause, Plaintiffs to suffer undue hardship and irreparable injury.

138.    As a direct and proximate result of Facebook's, Twitter's, and YouTube's violation of California law as set forth in this Complaint—violations which are made possible by § 230 of the CDA—Plaintiffs have suffered irreparable harm, including the loss of their right to free speech, entitling them to declaratory and injunctive relief.

139.    By operation and application of Facebook's, Twitter's, and YouTube's restrictions as set forth in this Complaint—restrictions which are made possible by § 230 of the CDA—Facebook, Twitter, and YouTube have unlawfully deprived Plaintiffs of their full and equal accommodations, advantages, facilities, privileges, or services in violation of § 51 of the California Civil Code.

140.    Plaintiffs lack an adequate or available administrative remedy.

141.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their legal rights.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for judgment as follows:

A.    That this Court declare that § 230 of the Communications Decency Act violates the First Amendment as set forth in this Complaint;

B.    That this Court issue an order preliminarily and permanently prohibiting Defendant Lynch from enforcing § 230 of the Communications Decency Act as set forth in this Complaint;

C.    That this Court award Plaintiffs their reasonable costs, including attorney's fees;

D.     That this Court grant such other and further relief as it deems equitable and just

under the circumstances.

Respectfully submitted,

**AMERICAN FREEDOM LAW CENTER**

/s/ *Robert J. Muise*
Robert J. Muise, Esq. (D.C. Court Bar No. MI 0052)
P.O. Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756
rmuise@americanfreedomlawcenter.org

/s/ *David Yerushalmi*
David Yerushalmi, Esq. (Ariz. Bar No. 009616;
DC Bar No. 978179; Cal. Bar No. 132011;
NY Bar No. 4632568)
1901 Pennsylvania Avenue NW
Suite 201
Washington, D.C. 20006
dyerushalmi@americanfreedomlawcenter.org
(646) 262-0500

*Counsel for Plaintiffs*