UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FREEDOM DEFENSE INITIATIVE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> LORETTA LYNCH, in her official capacity as ATTORNEY GENERAL OF THE UNITED STATES, <br><br> Defendant. | Civil Action No. 16-1437 (JEB) |

**MEMORANDUM OPINION**

Facebook, YouTube, and Twitter may be host to a mélange of cat videos, musings from long-lost cousins, and odes to Beyoncé, but not all content is welcome on these social-media platforms. Pursuant to their private terms of service, the companies have repeatedly taken down some of Plaintiffs' posts criticizing Islam. Plaintiffs — two non-profit organizations and their leaders — allege that such action constitutes censorship and discrimination on the basis of content, viewpoint, and religion. Yet a quick glance at this case's caption reveals a surprise: Plaintiffs have not named the companies as Defendants. Instead, they have sued only the United States Attorney General, alleging that a provision in a federal statute — § 230 of the Communications Decency Act — enables the companies' censorship and discrimination and violates the First Amendment. Defendant now moves to dismiss, arguing that Plaintiffs can neither establish standing nor state a cognizable constitutional claim. Agreeing that standing is lacking here, the Court will grant the Motion.

**I.      Background**

As it must at this stage, the Court considers the facts as pled in the Complaint.  Plaintiffs are two non-profit organizations — American Freedom Defense Initiative and Jihad Watch — and two of their leaders — Pamela Geller and Robert Spencer.  "AFDI is dedicated to freedom of speech, freedom of conscience, freedom of religion, and individual rights."  Compl., ¶ 6.  Jihad Watch has a similar orientation and, in particular, "is dedicated to exposing the truth, including the motives and goals, of Islamic jihadists."  Id., ¶ 18.  Geller, AFDI's president, has authored The Post-American Presidency: The Obama Administration's War on America and Stop the Islamization of America: A Practical Guide to the Resistance.  Id., ¶ 12.  Spencer, AFDI's vice president and the director of Jihad Watch, has authored, among other books, The Truth About Muhammad and The Politically Incorrect Guide to Islam (and the Crusades).  Id., ¶ 17.  Plaintiffs actively use social media to share their religious and political views and to promote their related non-profit and commercial work.  Id., ¶¶ 6-26.  Thousands of individuals have "liked" Plaintiffs' Facebook pages, followed them on Twitter, and subscribed to their YouTube channels.  Id., ¶¶ 13-14, 16-17, 21-22, 25-26.

Facebook, Twitter, and YouTube maintain publicly available policies that prohibit third-party users like Plaintiffs from posting certain content on their sites.  Id., ¶¶ 95-96, 98, 100, 103-09, 117, 119.  Facebook, for example, according to a "Warning" included in Plaintiffs' Complaint, does not allow "groups that are hateful, threatening, or obscene," and "take[s] down groups that attack an individual or group."  Id., ¶ 87.  YouTube prohibits, among other things, "hateful content."  Id., ¶ 100.  And Twitter bans "the promotion of hate content, sensitive topics, and violence globally," "[o]ffensive, vulgar, abusive or obscene content," and "[i]nflammatory content which is likely to evoke a strong negative reaction or cause harm."  Id., ¶¶ 105, 108.

Pursuant to these policies, the three social-media platforms have, at various points, removed Plaintiffs' content from their sites.  In March 2016, for example, Facebook removed from Geller's "Islamic Jew-Hatred: It's In the Quran" page a photograph of an individual holding a sign reading "Death to All Juice [*sic*]" at an anti-Israel rally in New York City.  Id., ¶¶ 79-82.  Facebook also removed from Geller's "Stop Islamization of America" page a photograph depicting graffiti reading "Kill the Jews" and "Jihad Against Israel" and directed Geller to review Facebook's Community Standards and remove anything on her page that was not compliant.  Id., ¶¶ 85-86.  A few months later, Facebook removed "Stop Islamization of America" entirely, explaining that the page violated the company's Terms of Use.  Id., ¶ 87.  YouTube also removed one of Geller's videos, which featured "a first-hand undercover investigation" in a Nashville mosque.  Id., ¶ 102.

At times, conversely, Plaintiffs sought to invoke the companies' policies to have other users' content removed, but those efforts were unsuccessful.  Twitter and Facebook "profess[] a policy of protecting intellectual property," id., ¶¶ 117, 119, but determined that a group's use of the name "American Jihad Watch" did not infringe on Plaintiff Jihad Watch's trademark and so permitted its continued use.  Id., ¶¶ 118, 120.  The two social-media companies also declined to remove tweets and posts that contained threats against Spencer, including that he should be "shot" and "lynched."  Id., ¶¶ 121-24.

These and other actions led Plaintiffs to conclude that Facebook, YouTube, and Twitter employ their company policies to suppress the speech and activities of disfavored speakers, including Plaintiffs, and to discriminate against "certain political parties, national origins, and religions," particularly Israelis, Jews, and conservatives.  Id., ¶¶ 93, 95, 126.

Yet Plaintiffs have not brought this suit against the social-media companies. Instead, in July 2016, they named the United States Attorney General as the lone Defendant. They did so because they blame a provision in a federal statute — § 230 of the Communications Decency Act — for enabling the companies' policies and the discriminatory actions taken pursuant to those policies. Id., ¶¶ 97, 99, 111, 125. Plaintiffs allege that § 230 of the CDA, both facially and as applied, violates the First Amendment because it is a content- and viewpoint-based restriction; is vague, overbroad, and lacking in objective criteria; and permits Facebook, Twitter, and YouTube "to engage in government-sanctioned discrimination that would otherwise violate California Civil Code § 51," which prohibits discrimination by all business establishments in California, and Article I, section 2 of the California Constitution, which protects the freedom of speech. Id., ¶¶ 128-41. Plaintiffs seek a declaration that § 230 violates the First Amendment and a preliminary and permanent injunction prohibiting the Attorney General from enforcing the provision. Id. at 24.

Defendant now moves to dismiss the case on two grounds: (1) Plaintiffs cannot establish the causation and redressability elements necessary for Article III standing, and (2) they cannot identify any state action that implicates the First Amendment and thus fail to state a cognizable constitutional claim. See Mot. at 1-2. The Court need only analyze the first.

**II.     Legal Standard**

In evaluating Defendant's Motion to Dismiss, the Court must "treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal quotation marks and citation omitted); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). This standard governs the Court's considerations of Defendant's contentions under both

Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982) ("[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader.").  The Court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the Complaint.  Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

To survive a motion to dismiss under Rule 12(b)(1), Plaintiffs bear the burden of proving that the Court has subject-matter jurisdiction to hear their claims.  See DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 342 & n.3 (2006); Arpaio v. Obama, 797 F.3d 11, 19 (D.C. Cir. 2015).  A court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."  Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  For this reason, "'Plaintiff[s'] factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."  Id. at 13-14 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987)).  Additionally, unlike with a motion to dismiss under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

**III.    Analysis**

As the Court may only act when it has subject-matter jurisdiction, it begins with Defendant's standing argument.  Article III of the United States Constitution limits the

jurisdiction of the federal courts to resolving "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. A party's standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). To establish standing, a party must, at a constitutional minimum, meet the following criteria. First, the plaintiff "must have suffered an 'injury in fact' — an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) 'actual or imminent, not 'conjectural' or 'hypothetical.'" Id. (citations omitted). Second, "there must be a causal connection between the injury and the conduct complained of — the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" Id. (alterations in original) (citation omitted). Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Id. at 561 (citation omitted). A "deficiency on any one of the three prongs suffices to defeat standing." US Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).

Plaintiffs here allege two forms of injury: an "inability to express certain views" because of discriminatory censorship by private social-media companies and an "economic injury" that flows from the companies' removal of Plaintiffs' online content. See Opp. at 8. The Court assumes without deciding that Plaintiffs have thus plausibly alleged an injury in fact. That asserted injury, however, is not fairly traceable to the Attorney General, nor is it likely to be redressed by the relief sought. Before explaining why, the Court first provides a brief primer on the challenged statutory provision.

A. Section 230

Section 230 of the Communications Decency Act — captioned "Protection for private blocking and screening of offensive material," 47 U.S.C. § 230 — "immunizes providers of

interactive computer services against liability arising from content created by third parties." Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC, 521 F.3d 1157, 1162 (9th Cir. 2008) (*en banc*). Specifically, it commands that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). It further states that "[n]o provider or user of an interactive computer service shall be held liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." Id. § 230(c)(2)(A). A later section gives that protection preemptive effective, providing that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." Id. § 230(e)(3).

As is relevant here, § 230 defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet." Id. § 230(f)(2). Plaintiffs appear to assume that Facebook, Twitter, and YouTube are providers of interactive computer services, and courts have also so held. See, e.g., Klayman v. Zuckerberg, 753 F.3d 1354, 1357-58 (D.C. Cir. 2014) (holding Facebook is interactive computer-service provider); Lancaster v. Alphabet Inc., 2016 WL 3648608, at *3 (N.D. Cal. July 8, 2016) (same as to YouTube). An "information content provider," conversely, is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). This definition covers Plaintiffs here.

What is the point of such a provision? Interactive computer services like Facebook, YouTube, and Twitter can, for example, "perform some editing on user-generated content without thereby becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or delete." Roommates.Com, 521 F.3d at 1163. "[L]awsuits seeking to hold [them] liable for [their] exercise of a publisher's traditional editorial functions — such as deciding whether to publish, withdraw, postpone or alter content — are barred." Zeran v. Am. Online, Inc., 129 F.3d 327, 330 (4th Cir. 1997).

The statutory language makes clear, moreover, that § 230 is not enforced by the Attorney General, but is instead a form of protection from civil liability for companies such as those mentioned here. Plaintiffs cite Reno v. ACLU, 521 U.S. 844 (1997), to contend otherwise, see Compl., ¶ 77; Opp. at 10-11, but their reliance on Reno is misplaced. That case involved constitutional challenges to two other provisions of the CDA, 47 U.S.C. § 223(a)(1)(B)(ii) and (d), which criminalized certain online conduct to protect minors. See 521 U.S. at 861-64. While the Department of Justice might well enforce those provisions, Reno said nothing about § 230. That section does not grant the Attorney General any power to impose criminal or civil liability, nor to direct or forbid interactive computer services to take any particular action vis-à-vis third-party users, including deleting objectionable content. Indeed, § 230 affords Defendant no role — enforcement or otherwise — of any kind, nor does it delegate any enforcement role to any federal agency or federal official.

B.  Standing

Defendant's lack of enforcement authority is fatal to Plaintiffs' standing to bring this action, for it is a "long-standing rule that a plaintiff may not sue a[n] . . . official who is without any power to enforce the complained-of statute." Okpalobi v. Foster, 244 F.3d 405, 426 (5th Cir.

2001) (*en banc*) (citing Gritts v. Fisher, 224 U.S. 640 (1912); Muskrat v. United States, 219 U.S. 346 (1911)); see also Digital Recognition Network, Inc. v. Hutchinson, 803 F.3d 952, 957-58 (8th Cir. 2015) ("[W]hen a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision.") (quoting Bronson v. Swensen, 500 F.3d 1099, 1110 (10th Cir. 2007)); Hope Clinic v. Ryan, 249 F.3d 603, 606 (7th Cir. 2001) (*per curiam*) ("Because the public officials named as defendants could not cause the plaintiffs any injury by enforcing the statutes' private-action provisions . . . [,] the plaintiffs lack standing with respect to these provisions."); 13A Charles A. Wright & Arthur R. Miller *et al.*, Federal Practice & Procedure § 3531.5 (3d ed. 2016).

Although the cases just cited concerned suits against state officials, the Court can discern no principled reason why their logic as to Article III standing would not apply with equal force to suits against federal officials (or the federal government), and Plaintiffs offer none. Because the Attorney General lacks the authority to enforce § 230, the injury alleged here is not fairly traceable to her actions. Plaintiffs therefore cannot satisfy the causation prong of Article III's standing inquiry.

For similar reasons, it is not "likely" that Plaintiffs' "injury will be redressed by a favorable decision." Lujan, 504 U.S. at 561 (internal quotation marks and citation omitted). Plaintiffs seek an injunction prohibiting Defendant from enforcing § 230 and a declaration that the provision violates the First Amendment. See Compl. at 24. As the Attorney General has no enforcement authority, such an injunction would be meaningless. See Digital Recognition Network, 803 F.3d at 958 (citing Bronson, 500 F.3d at 1111; Okpalobi, 244 F.3d at 426-27); Scott v. Taylor, 405 F.3d 1251, 1259 (11th Cir. 2005) (Jordan, D.J., concurring) ("[I]n a suit

against state officials for injunctive relief, a plaintiff does not have Article III standing with respect to those officials who are powerless to remedy the alleged injury."). It would not constrain Facebook, Twitter, or YouTube from invoking § 230 as a defense to any state-law discrimination or censorship action brought against them by Plaintiffs, nor would it restore Plaintiffs' removed content or legally prevent the social-media platforms from deleting or otherwise editing Plaintiffs' content in the future.

The requested declaratory relief suffers from similar redressability defects. Plaintiffs' argument rests on the entirely speculative implication that Facebook, Twitter, and YouTube would voluntarily change course and permit Plaintiffs' censored content to stand were the Attorney General to declare § 230 unconstitutional. Indeed, even absent the affirmative defense supplied by § 230, the private social-media companies could argue that they cannot be compelled to publish a particular message. See, e.g., Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston, 515 U.S. 557, 573-74 (1995) ("[O]ne important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say . . . . [That] rule's benefit [is not] restricted to the press, being enjoyed by business corporations generally . . . as well as by professional publishers.") (internal quotation marks and citation omitted); Miami Herald Publ'g Co. v. Tornillo, 418 U.S. 241, 256-58 (1974) (holding unconstitutional a Florida statute requiring newspapers to provide political candidates with free space to reply to attacks on their character); Mazur v. Szporer, 2004 WL 1944849, at *8 (D.D.C. June 1, 2004) (explaining that Miami Herald "held that governmental intrusion into the function of newspaper editors in deciding what to publish is a violation of the First Amendment").

Plaintiffs' contention that a declaratory judgment against the Attorney General would redress its asserted injury "overlooks the principle that it must be the effect of the court's

judgment <u>on the defendant</u> that redresses the plaintiff's injury." <u>Nova Health Sys. v. Gandy</u>, 416 F.3d 1149, 1159 (10th Cir. 2005) (emphasis added). "A declaration that [§ 230] is unconstitutional would not redress [Plaintiffs'] injury by virtue of its effect <u>on the defendant officials</u>." <u>Digital Recognition Network</u>, 803 F.3d at 958. At most, such a declaration might somehow indirectly affect the behavior of the social-media companies as to Plaintiffs' content — but that, again, is a wholly speculative proposition. <u>Id.</u> at 959 ("Because the defendant officials do not enforce the Act, a declaratory judgment would not meet the requirement of redressability.") (citing <u>Bronson</u>, 500 F.3d at 1112; <u>Gandy</u>, 416 F.3d at 1159; <u>Okpalobi</u>, 244 F.3d at 423 n.31; <u>id.</u> at 431 (Higginbotham, J., concurring)).

If Plaintiffs remain unhappy with the companies' content decisions, they can sue <u>them</u> and attempt to defeat any § 230 defense that is raised — *e.g.*, by invoking the same constitutional arguments offered here. How such litigation might fare is, of course, beyond this Court's power to divine.

**IV.     Conclusion**

For the foregoing reasons, the Court will grant Defendant's Motion to Dismiss. A separate Order so stating will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  November 9, 2016